# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
#### 3:19-cv-00195-RJC-DCK

| | | |
|---|---|---|
| SOFTWARE PRICING PARTNERS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | <u>ORDER</u> |
| JAMES H. GEISMAN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**THIS MATTER** comes before the Court on Defendant's motion to dismiss for lack of personal jurisdiction, (Doc. No. 18), Defendant's motion to dismiss for failure to state a claim, (Doc. No. 20), and the Magistrate Judge's Memorandum and Recommendation ("M&R"), (Doc. No. 35).

## I.    BACKGROUND

Plaintiff Software Pricing Partners, LLC ("Plaintiff" or "SPP") is a limited liability company organized under North Carolina law with its principal place of business in North Carolina. (Doc. No. 1, ¶ 1.) Chris Mele, a North Carolina resident, and Defendant James H. Geisman, a Massachusetts resident, formed SPP in June 2015. (Doc. No. 1, ¶ 14; Doc. No. 12, ¶ 1.) Mele and Geisman were equal co-members and managers of SPP. (Doc. No. 1, ¶ 14; Doc. No. 1-1, § 6.1.)

SPP provides software companies with pricing tactics, program and project management solutions, and project deployment services needed to increase a company's overall profitability and improve its growth. (Doc. No. 1, ¶ 11.) SPP has

developed unique algorithms, approaches, frameworks, and insights for software companies to deploy complex tailored licensing, packaging, pricing, and discounting models into their operations. (Doc. No. 1, ¶ 12.) In their roles at SPP, Geisman and Mele spent considerable time developing innovative tools, formulae, and techniques for building pricing and licensing models and packaging software features. (Doc. No. 1, ¶ 22.)

In March 2018, SPP and Geisman began discussing Geisman exiting the business. (Doc. No. 1, ¶ 33.) The discussions ultimately culminated in a Member Exit Agreement ("MEA") between SPP, Mele, and Geisman, which they executed on July 15, 2018. (Doc. No. 1-2.) Pursuant to the MEA, SPP redeemed Geisman's membership interest in the company, and Geisman resigned from his position as a manager and officer of SPP. (Doc. No. 1-2, ¶¶ 2–3.) Geisman agreed that for the two-year period following the MEA, he would provide Mele "with reasonable knowledge transfer and transition assistance" to assist in transitioning the entirety of SPP's business to Mele and to assist Mele in performing services for SPP's customers. (Doc. No. 1-2, ¶ 9.) In addition, the MEA contains restrictive covenants prohibiting Geisman from competing with SPP and soliciting SPP's customers, as well as provisions prohibiting Geisman from using or disclosing SPP's intellectual property and confidential information. (Doc. No. 1-2, ¶¶ 17–19.)

SPP alleges that after the parties executed the MEA, Geisman misappropriated confidential information and trade secrets from SPP and used such information and trade secrets to solicit business in competition with SPP. Based on

2

those allegations, SPP filed a complaint on April 19, 2019 bringing claims against Geisman for (1) breach of the MEA, (2) misappropriation of trade secrets under the North Carolina Trade Secrets Protection Act ("NCTSPA") and common law, (3) misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), and (4) unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1. On May 14, 2019, SPP filed a motion for a preliminary injunction. (Doc. No. 4.) On June 10, 2019, Geisman filed a motion to dismiss for lack of personal jurisdiction, one of the motions to dismiss presently before the Court. (Doc. No. 18.) The next day, the Court held a hearing that was limited to SPP's preliminary injunction motion, (Doc. No. 22), which the Court granted in part and denied in part on August 7, 2019, (Doc. No. 32). On June 14, 2019, Geisman filed a motion to dismiss for failure to state a claim, the second motion to dismiss presently before the Court. (Doc. No. 20.) In the M&R, the Magistrate Judge recommended that this Court grant Geisman's motion to dismiss for lack of personal jurisdiction and deny as moot Geisman's motion to dismiss for failure to state a claim. (Doc. No. 35, at 10.) SPP timely filed objections to the M&R. (Doc. No. 38.)

## II. MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

### A. Standard of Review

A district court may assign dispositive pretrial matters to a magistrate judge for "proposed findings of fact and recommendations." 28 U.S.C. § 636(b)(1)(B). The Federal Magistrate Act provides that the district court "shall made a de novo determination of those portions of the report or specific proposed findings or

recommendations to which objection is made." Id. § 636(b)(1); Camby v. Davis, 718 F.2d 198, 199 (4th Cir. 1983).

"When personal jurisdiction is properly challenged under Rule 12(b)(2), the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 396 (4th Cir. 2003). However, "[w]hen personal jurisdiction is addressed under Rule 12(b)(2) without an evidentiary hearing, the party asserting jurisdiction has the burden of establishing a prima facie case of jurisdiction. This 'prima facie case' analysis resembles the plausibility inquiry governing motions to dismiss for failure to state a claim under Rule 12(b)(6)." Hawkins v. i-TV Digitalis Tavkozlesi zrt., 935 F.3d 211, 226 (4th Cir. 2019). "[T]he district court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Universal Leather, LLC v. Koro Ar, S.A., 773 F.3d 553, 558 (4th Cir. 2014) (quotation marks omitted). Yet a prima facie finding of personal jurisdiction does not necessarily resolve the issue because "if the court denies a Rule 12(b)(2) motion under the prima facie standard, it can later revisit the jurisdictional issue when a fuller record is presented because the plaintiff 'bears the burden of demonstrating personal jurisdiction at every stage following [the defendant's jurisdictional] challenge.'" Sneha Media & Entm't, LLC v. Assoc. Broad. Co. P, 911 F.3d 192, 196–97 (4th Cir. 2018) (alteration in original) (quoting Grayson v. Anderson, 816 F.3d 262, 268 (4th Cir. 2016)).

## B. Discussion

The M&R determined that Geisman's contacts with North Carolina are insufficient to support the exercise of personal jurisdiction. Underlying that determination is a release in the MEA pursuant to which SPP released certain claims against Geisman. SPP primarily objects to the M&R's application of the release to its jurisdictional analysis. As explained more fully before, the Court concludes that the release does not prohibit the Court from considering Geisman's case-related contacts with North Carolina prior to the MEA. Considering all of Geisman's case-related contacts with North Carolina, including those prior to the MEA, the Court concludes that SPP has minimally satisfied its burden at this stage to make a prima facie showing of personal jurisdiction.

A district court may properly assert personal jurisdiction over a nonresident defendant only if (1) jurisdiction is authorized by the long-arm statute of the state in which the district court sits, and (2) assertion of that jurisdiction is consistent with constitutional due process. Universal Leather, 773 F.3d at 558. "North Carolina's longarm statute is construed to extend jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause." Christian Sci. Bd. of Dirs. of the First Church of Christ. Scientist v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001). Thus, the two-prong test collapses into a single inquiry as to whether the exercise of jurisdiction over a defendant is consistent with due process. Id.

"A court's exercise of jurisdiction over a nonresident defendant comports with due process if the defendant has 'minimum contacts' with the forum, such that to

require the defendant to defend its interest in that state 'does not offend traditional notions of fair play and substantial justice.'" Carefirst of Md., 334 F.3d at 397 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). There are two types of personal jurisdiction: general and specific. Sneha Media & Entm't, 911 F.3d at 198. Here, only specific jurisdiction is at issue.

"The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." Walden v. Fiore, 571 U.S. 277, 283–84 (2014) (quotation marks omitted). "For a court to have specific personal jurisdiction over a defendant, the defendant must have 'purposefully established minimum contacts in the forum State' such 'that [it] should reasonably anticipate being haled into court there.'" Perdue Foods LLC v. BRF S.A., 814 F.3d 185, 189 (4th Cir. 2016) (alteration in original) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985)). "These requirements are met, and specific jurisdiction may be exercised, if 'the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities.'" Fidrych v. Marriott Int'l, Inc., 952 F.3d 124, 138 (4th Cir. 2020) (quoting Burger King, 471 U.S. at 472).

In determining whether specific jurisdiction exists, courts in the Fourth Circuit consider "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal

6

jurisdiction would be constitutionally reasonable." ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002) (quotation marks omitted). "The first prong articulates the minimum contacts requirement of constitutional due process that the defendant purposefully avail himself of the privilege of conducting business under the laws of the forum state." Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 278 (4th Cir. 2009). "This purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." Fidrych, 952 F.3d at 140. "Frequently, the minimum contacts inquiry looks to the defendants' 'continuing relationships and obligations with citizens of [the forum state].'" Ryan v. TEV Corp., No. 18-cv-3852, 2019 U.S. Dist. LEXIS 189660, at *13 (D. Md. Nov. 1, 2019) (alteration in original) (quoting Burger King, 471 U.S. at 473).

In order to satisfy the second prong, "the suit must arise out of or relate to the defendant's contacts with the forum." Fidrych, 952 F.3d at 138 (quoting Bristol-Myers Squibb Co. v. Superior Court of Cal., 137 S. Ct. 1773, 1780 (2017)). "The analysis here is generally not complicated. Where activity in the forum state is the genesis of the dispute, this prong is easily satisfied." Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co., 682 F.3d 292, 303 (4th Cir. 2012) (quotation marks and brackets omitted). This prong is also satisfied where "substantial correspondence and collaboration between the parties, one of which is based in the forum state, forms an important part of the claim." Id. And last, the reasonableness prong "is designed

7

to ensure that jurisdictional rules are not exploited in such a way as to make litigation so gravely difficult and inconvenient that a party unfairly is at a severe disadvantage in comparison to his opponent." Nolan, 259 F.3d at 217 (quotation marks omitted). This inquiry permits a defendant to defeat jurisdiction "if he can 'present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" Ryan, 2019 U.S. Dist. LEXIS 189660, at *20 (quoting Burger King, 471 U.S. at 477).

Here, Geisman argues that the release in the MEA limits the conduct that the Court may consider for purposes of personal jurisdiction. The release states:

> [SPP] hereby irrevocably and unconditionally releases, settles, cancels, discharges and acknowledges to be fully and finally satisfied any and all claims, demands, rights, actions, causes of action, debts, accounts, covenants, contracts, agreements, promises, damages, costs, reimbursements, compensation, liabilities and expenses, including attorneys' fees, of any and every kind, nature or description whatsoever, known or unknown, at law or in equity . . . which [SPP] may have had or may now have or assert against . . . Geisman . . . , which are on account of any matter whatsoever attributable to the period, or arising during the period, from the beginning of time through and including the date hereof . . . ; provided, however, the [released claims] shall not include any [claims] arising out of a breach of this Agreement.

(Doc. No. 1-2, ¶ 13(c).) Geisman argues that because SPP released all known or unknown claims it had against Geisman as of July 15, 2018—the date of the MEA— Geisman can only be liable to SPP for post-MEA conduct. According to Geisman, because he can only be liable for post-MEA conduct, his pre-MEA conduct is irrelevant to the issue of whether this Court has personal jurisdiction over Geisman regarding claims that accrued post-MEA.

The Court agrees that pursuant to the MEA's express language, SPP released

all claims it had against Geisman as of the date of the MEA, including any unknown claims. Notwithstanding this fact, the release does not prohibit consideration of Geisman's contacts with North Carolina that occurred prior to the MEA but that nonetheless relate to unreleased claims that accrued after the MEA. Put differently, while the release limits Geisman's liability for pre-MEA conduct, it does not limit consideration of his pre-MEA conduct for jurisdictional purposes insofar as that conduct relates to claims based on Geisman's post-MEA conduct.

And Geisman had pre-MEA contacts with North Carolina that relate to this suit, which centers on Geisman's exit from SPP as a member and manager. SPP's claims allege that in his separation from SPP, Geisman misappropriated SPP's confidential information and trade secrets and used the misappropriated information to compete with SPP in violation of the MEA and state and federal law. Geisman— together with Mele, a North Carolina resident—formed SPP under North Carolina law and established its principal place of business in North Carolina. Upon SPP's formation, Geisman agreed to dissolve Software Pricing Partners, Inc., of which Geisman was the sole owner, and assign to SPP all intellectual property used in the operation of Software Pricing Partners, Inc.—property which SPP alleges Geisman misappropriated after he left SPP. (Doc. No. 1-1, §§ 2.3–2.4.) From June 2015 through July 15, 2018, Geisman served as an equal co-member and manager of SPP. During the beginning years of the business, Geisman frequently travelled to North Carolina to assist in developing SPP's intellectual property and confidential information, sometimes as often as every three to six weeks. (Doc. No. 22, at 13:13–

9

21, 14:7–20, 83:23–84:5.) This is the very information that SPP alleges Geisman misappropriated upon his exit from SPP.

In addition, Geisman negotiated and executed the MEA with Mele and SPP, two North Carolina residents. Although a contract with a resident of the forum state does not automatically in and of itself establish sufficient minimum contacts with the forum state, <u>Burger King</u>, 471 U.S. at 478, Geisman sent drafts of the MEA to Mele in North Carolina and sent his executed version of the MEA to Mele in North Carolina, (Doc. No. 28, at Pl.'s Exs. 2-2, 3-2; Doc. No. 22, at 83:14–18). Moreover, the MEA created continuing obligations of Geisman to SPP and Mele, North Carolina citizens. For example, Geisman agreed that during the two-year period following the MEA, he would assist Mele in transitioning the entirety of SPP's business to Mele and in performing services for SPP customers. <u>See</u> <u>Fidrych</u>, 952 F.3d at 140 (stating that where defendant "has created continuing obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there" (quoting <u>Burger King</u>, 471 U.S. at 475–76)).

In sum, considering all of Geisman's case-related contacts with North Carolina and drawing the most favorable inferences for the existence of jurisdiction, the Court concludes that SPP has satisfied its burden at this stage of the litigation to make a prima facie showing of personal jurisdiction. "Given that Plaintiff has made the requisite prima facie demonstration of personal jurisdiction, the Court can proceed as if it has personal jurisdiction over this matter, although factual determinations to the contrary may be made at a later stage of this proceeding." <u>Legacy Data Access,</u>

LLC v. Mediquant, Inc., No. 3:15-cv-00584, 2016 U.S. Dist. LEXIS 23714, at *7 (W.D.N.C. Feb. 25, 2016) (quotation marks omitted).

## III.    MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Having concluded that SPP has made a prima facie showing of personal jurisdiction, the Court turns to Geisman's motion to dismiss for failure to state a claim.

### A.    Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the complaint. Fannie Mae v. Quicksilver LLC, 155 F. Supp. 3d 535, 542 (M.D.N.C. 2015). A complaint attacked by a Rule 12(b)(6) motion to dismiss will survive if it contains enough facts "to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Facial plausibility means allegations that allow the court to draw the reasonable inference that defendant is liable for the misconduct alleged. Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678.

At the same time, specific facts are not necessary—the complaint need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Twombly, 550 U.S. at 555. Additionally, when ruling on a motion to dismiss, a court must accept as true all factual allegations contained in the complaint. Erickson v. Pardus, 551 U.S. 89, 93–94 (2007). Nonetheless, a court is not bound to accept as true legal conclusions couched as factual allegations. Papasan v. Allain,

478 U.S. 265, 286 (1986). "Courts cannot weigh the facts or assess the evidence at this stage, but a complaint entirely devoid of any facts supporting a given claim cannot proceed." Potomac Conference Corp. of Seventh-Day Adventists v. Takoma Acad. Alumni Ass'n, Inc., 2 F. Supp. 3d 758, 767–68 (D. Md. 2014). Furthermore, the court "should view the complaint in a light most favorable to the plaintiff." Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993).

## B.    Breach of the MEA

Geisman argues that the complaint fails to state a claim for breach of the MEA because the provisions at issue constitute unreasonable restrictive covenants that are unenforceable as a matter of law.

"Covenants not to compete are disfavored in North Carolina." RLM Commc'ns, Inc. v. Tuschen, 831 F.3d 190, 196 (4th Cir. 2016). "To be enforceable, a covenant must, among other things, be reasonable as to time, territory, and scope of activity." Asheboro Paper & Packaging, Inc. v. Dickinson, 599 F. Supp. 2d 664, 671 (M.D.N.C. 2009). To be reasonable, "the restrictions must be no wider in scope than is necessary to protect the business of the [promisee]." Medical Staffing Network, Inc. v. Ridgway, 670 S.E.2d 321, 327 (N.C. Ct. App. 2009) (quotation marks omitted). A court must assess the reasonableness of a covenant's time and territory restrictions in tandem. Clinical Staffing, Inc. v. Worldwide Travel Staffing, 60 F. Supp. 3d 618, 624 (E.D.N.C. 2013). "Although either the time or the territory restriction, standing alone, may be reasonable, the combined effect of the two may be unreasonable." Farr Assocs., Inc. v. Baskin, 530 S.E.2d 878, 881 (N.C. Ct. App. 2000). "Generally, the shorter the time

period in the covenant not to compete, the larger the geographic restriction may be. Likewise, the longer the time period in the covenant not to compete, the smaller the geographic restriction must be." Clinical Staffing, 60 F. Supp. 3d at 624 (citation omitted). Nevertheless, "time restrictions of a certain length are presumed unreasonable absent a showing of special circumstances." Farr Assocs., 530 S.E.2d at 881. In the employment context, a "five-year time restriction is the outer boundary which [North Carolina] courts have considered reasonable, and even so, five-year restrictions are not favored." Id. "A restriction as to territory is reasonable only to the extent it protects the legitimate interests of the [promisee] in maintaining [its] customers." Hejl v. Hood, Hargett & Assocs., 674 S.E.2d 425, 429 (N.C. Ct. App. 2009) (second alteration in original). Thus, "the reasonableness of a geographic restriction depends upon where the business' customers are located and [whether] the geographic scope of the covenant is necessary to maintain those customer relationships." Outdoor Lighting Perspectives Franchising v. Harders, 747 S.E.2d 256, 264 (N.C. Ct. App. 2013) (alteration in original) (quotation marks omitted).

Restrictive covenants "contained in an employment contract are more closely scrutinized than those contained in a contract for the sale of a business." Id. at 262 (quotation marks omitted). Often, restrictive covenants appear in agreements that are neither for employment nor the sale of a business. When dealing with a restrictive covenant in an agreement that does not "fit neatly into either the employer-employee category or the business sale category," a court need not "determine on which side of the line separating the employer-employee context from

13

the sale of business context the case in question falls." Id. at 262–63.  As with any other restrictive covenant, the court is to analyze "the reasonableness of the restrictions to which the plaintiff seeks to have the defendant subjected." Id.  The reasonableness of a restrictive covenant is a matter of law for the court to decide. Clinical Staffing, 60 F. Supp. 3d at 624.

### 1.    Non-Competition Provision

For purposes of the restrictive covenants, the MEA defines the following terms:

"Restricted Business" means the business of selling, licensing, performing or providing any products or services, and/or providing advice or consulting services, directly or indirectly related to software pricing or software monetization.

"Restricted Period" means the period commencing as of the date hereof and ending . . . 60 months after the date hereof . . . .

"Territory" means (A) each country where [SPP] currently or in the future does business or has a customer, and/or (B) the United States, and/or (C) each state where [SPP] currently or in the future does business, and/or (D) each state where [SPP] currently or in the future has a customer.

(Doc. No. 1-2, ¶ 17(a)(ii)–(iv).)  Paragraph 17(b) contains a non-competition provision that states:

During the Restricted Period, Geisman shall not, . . . directly or indirectly, or as a stockholder, partner, member, lender, investor, manager, director, employee, consultant, representative, advisor or other owner or participant in any Person[1] other than [SPP], (i) engage in or assist others in engaging in the Restricted Business in the Territory; (ii) have an interest in any Person that engages directly or indirectly in the Restricted Business in the Territory in any capacity, including as a partner, shareholder, member, employee, principal,

---

[1] "Person" is defined as "an individual, corporation, partnership, association, limited liability company, trust, estate or other entity."  (Doc. No. 1-2, ¶ 1; Doc. No. 1-1, at 31.)

14

agent, trustee or consultant; . . . .

(Doc. No. 1-2, ¶ 17(b).)

The non-competition provision is vastly overbroad and thus unenforceable as a matter of law. As an initial matter, the geographic restriction extends to any country where SPP "in the future does business or has a customer." Geographic restrictions that include areas in which the company had no business or customers at the time of the agreement are unreasonable. <u>Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC</u>, 784 S.E.2d 457, 461 (N.C. 2016) (concluding that the geographic restriction in a business sale agreement was unreasonable because at the time of the agreement, the business had no customers in large portions of the area covered by the agreement). By extending to locations where SPP in the future does business or has a customer, the geographic restriction is unreasonable.

In its response brief, Plaintiff does not address the geographic restriction or otherwise argue that it is reasonable or could be blue-penciled.[2] Even if the Court could use its limited blue pencil authority to narrow the geographic restriction to the United States, the nationwide restriction coupled with the five-year time restriction

---

[2] "[B]lue-penciling is the process by which a court of equity will take notice of the divisions the parties themselves have made in a covenant not to compete, and enforce the restrictions in the territorial divisions deemed reasonable and refuse to enforce them in divisions deemed unreasonable." <u>Beverage Sys.</u>, 784 S.E.2d at 461 (quotation marks and brackets omitted). "But North Carolina's blue-pencil rule severely limits what the court may do to alter an overly broad covenant not to compete." <u>RLM Commc'ns</u>, 831 F.3d at 197 (quotation marks omitted). When a restrictive covenant is unreasonable, the court cannot unilaterally amend the terms of the contract. <u>Beverage Sys.</u>, 784 S.E.2d at 461. A covenant's "territorial limits cannot be blue-penciled unless the [covenant] can be interpreted so that it sets out both reasonable and unreasonable restricted territories." <u>Id.</u>

Case 3:19-cv-00195-RJC-DCK   Document 40   Filed 06/16/20   Page 15 of 27

would still be unreasonable. See Farr Assocs., 530 S.E.2d at 881 (stating that the time and territory restrictions must be considered in tandem and "[a] longer period of time is acceptable where the geographic restriction is relatively small, and vice versa"); Hartman v. W.H. Odell & Assocs., 450 S.E.2d 912, 918 (N.C. Ct. App. 1994) (noting that "[t]he North Carolina Supreme Court has stated that only 'extreme conditions' will support a five-year covenant").

Further, the non-competition provision is unenforceable because it prohibits Geisman from indirectly owning an interest in any non-public entity that engages directly or indirectly in providing products or services directly or indirectly related to software pricing or software monetization. Such a broad restriction on indirect ownership is greater than reasonably necessary to protect SPP's legitimate business interests. See Asheboro Paper & Packaging, 599 F. Supp. 2d at 674 ("Where a covenant requires an employee to have no association whatsoever with any business irrespective of whether he or she would be in a position to compete or divulge protected information, the covenant is overbroad."); Akzo Nobel Coatings, Inc. v. Rogers, 2011 NCBC LEXIS 42, at *42 (N.C. Super. Ct. Nov. 3, 2011) (concluding that a restrictive covenant was unenforceable where it prohibited indirect ownership of a competing business).

Therefore, the Court concludes that the non-competition provision is unenforceable.

### 2. Non-Solicitation Provision

A provision that prohibits solicitation of customers is a restrictive covenant

that must be reasonable to be enforceable. See Aesthetic Facial & Ocular Plastic Surgery Ctr., P.A. v. Zaldivar, 826 S.E.2d 723, 731–32 (N.C. Ct. App. 2019). The MEA contains a non-solicitation provision stating:

> During the Restricted Period, Geisman shall not, . . . directly or indirectly, solicit, divert away or entice, or attempt to solicit, divert away or entice, any clients, customers, prospects, referral sources, business partners, vendors, service providers, consultants, investors or agents of [SPP] or any other Person with whom [SPP] does business (collectively "Business Partners") or potential Business Partners.

(Doc. No. 1-2, ¶ 17(d).)

The protection of customer relations from misappropriation by a person leaving the business is recognized as a legitimate business interest. Farr Assocs., 530 S.E.2d at 881. Like any other covenant, however, a non-solicitation provision's restrictions must be no greater than necessary to protect that legitimate business interest. Zaldivar, 530 S.E.2d at 731. North Carolina courts have held that restrictive covenants that reach beyond customers to also include potential customers with whom the promisor had no contact are unreasonable. Hejl, 674 S.E.2d at 430 (concluding that a restrictive covenant was unenforceable where it reached not only clients, but also potential clients); Akzo Nobel Coatings, 2011 NBC LEXIS 42, at *33 ("Generally, covenants which seek to restrict a former employee from competing with future or prospective customers with whom they had no personal contact during employment fail as unnecessary to protect the legitimate business interests of the employer.").

Here, the non-solicitation provision prohibits Geisman from soliciting potential clients or customers, even those with whom he did not have any personal contact. In

fact, the non-solicitation provision goes so far as to prohibit Geisman from soliciting any person with whom SPP may potentially do business. As the above cases demonstrate, such a provision is unreasonable. Accordingly, the Court concludes that the non-solicitation provision is unenforceable.

### 3. Company Intellectual Property Provision

Geisman contends that the provision in the MEA prohibiting Geisman from using or disclosing "Company Intellectual Property" is an unreasonable restraint in trade. "When an agreement 'seeks to prevent the disclosure or use of confidential information' and 'does not seek to prevent a party from engaging in a similar business in competition with the [promisee],' it is 'not in restraint of trade.'" Creative Snacks Co., LLC v. Hello Delicious Brands LLC, No. 1:17cv50, 2017 U.S. Dist. LEXIS 146993, at *12 (M.D.N.C. Sept. 12, 2017) (quoting Chemimetals Processing, Inc. v. McEneny, 476 S.E.2d 374, 376 (N.C. Ct. App. 1996)). Such an agreement "may, therefore, be upheld even though the agreement is unlimited as to time and area, upon a showing that it protects a legitimate business interest of the promisee." Chemimetals Processing, 476 S.E.2d at 377 (citation omitted).

Here, paragraph 18 of the MEA prohibits Geisman from using "Company Intellectual Property" in any manner, except to the extent necessary and in connection with performing services for SPP. (Doc. No. 1-2, ¶ 18.) "Company Intellectual Property" is defined as "all inventions, improvements, frameworks, structures, work product, spreadsheets, methodologies, ideas, designs, discoveries, innovations, know-how, technology, contacts, relationships, studies, research,

information, content, and software, whether or not patentable, trademarkable or copyrightable, used or otherwise related to the business of [SPP]." (Doc. No. 1-2, ¶ 18.)

This provision goes beyond preventing disclosure or use of SPP's confidential information—it prohibits disclosure or use of all ideas, know-how, technology, contacts, relationships, and information related to SPP's business, regardless of whether such items are confidential. As this purported nondisclosure provision prevents use or disclosure of all information related to SPP's business, as well as all contacts and relationships related to SPP's business—except in connection with performing services for SPP—the provision is more appropriately characterized as a non-compete and must be reasonable as to time and territory. See Creative Snacks, 2017 U.S. Dist. LEXIS 146993, at *14–15 (concluding that a purported nondisclosure provision was more appropriately characterized as a covenant not to compete and finding that it was unreasonable); Duo-Fast Carolinas, Inc. v. Scott's Hill Hardware & Supply Co., Inc., 2018 WL 264607, at *11 (N.C. Super. Ct. Jan. 2, 2018) (concluding that a purported nondisclosure provision was really a non-solicitation provision such that its time and territory restrictions were required to be reasonable). The provision prohibiting Geisman from using or disclosing "Company Intellectual Property" is not limited as to time or territory and, as a result, is unenforceable. Duo-Fast Carolinas, 2018 WL 264607, at *11 (concluding that a purported nondisclosure provision was really a non-solicitation provision that was unenforceable because it was not limited as to time).

19

SPP also argues that, like the company intellectual property provision, paragraph 17(e) protects SPP from misappropriation of its intellectual property. Paragraph 17(e) states:

> During the Restricted Period, Geisman shall not, . . . directly or indirectly, teach, participate in marketing activities, publish, write papers or articles, or participate in seminars or conferences, or assist any other Person in any of the foregoing, to the extent any of the topics or content thereof involves software pricing or software monetization.

(Doc. No. 1-2, ¶ 17(e).) Although SPP contends that this provision protects it from misappropriation of its intellectual property, paragraph 17(e) is not limited to SPP's intellectual property. Instead, the provision prevents Geisman from teaching, writing a paper or article, and participating in a conference "to the extent any of the topics or content thereof involves software pricing or software monetization." Thus, paragraph 17(e) prohibits Geisman from writing a paper or article on software pricing or software monetization even if the paper consists entirely of public information in which SPP has no protectable interest. For this reason, the restrictions of paragraph 17(e) are overbroad and, thus, unenforceable.

### 4. Confidentiality Provision

The MEA also contains a confidentiality provision that prohibits Geisman from disclosing "all proprietary and confidential information relating to the assets and business of" SPP. (Doc. No. 1-2, ¶ 19.) Unlike the company intellectual property provision, the confidentiality provision seeks to prevent disclosure and use of "proprietary and confidential information." Such a provision is not, on its face, in restraint of trade. Static Control Components, Inc. v. Darkprint Imaging, Inc., 135

20

F. Supp. 2d 722, 730 (M.D.N.C. 2001) ("[U]nlike a noncompete agreement, an agreement is not a restraint of trade if it seeks to prevent disclosure or use of confidential information.").

*     *     *

In sum, the Court concludes that the MEA's non-competition provision (paragraph 17(b)), non-solicitation provision (paragraph 17(d)), company intellectual property provision (paragraph 18), and related provision restricting Geisman's ability to teach, write papers, and engage in other similar activities (paragraph 17(e)) are unenforceable as a matter of law. Therefore, SPP's claim for breach of the MEA is dismissed to the extent it is based on the unenforceable provisions. The Court cannot conclude that the MEA's confidentiality provision (paragraph 19) is an unreasonable restraint in trade, and SPP's claim for breach of this provision may go forward.

### C.    Misappropriation of Trade Secrets Under the NCTSPA

Geisman argues that SPP's claim for misappropriation of trade secrets under the NCTSPA fails because the alleged misappropriation occurred outside North Carolina and, thus, the NCTSPA does not apply.

The North Carolina Supreme Court recently held that the *lex loci* test is the appropriate choice of law rule for claims under the NCTSPA. SciGrip, Inc. v. Osae, 838 S.E.2d 334, 343 (N.C. 2020) ("SciGrip II"). Under this test, "the substantive law of the state where the injury or harm was sustained or suffered, which is, ordinarily, the state where the last event necessary to make the actor liable or the last event required to constitute the tort takes place, applies." Id. (quotation marks omitted).

The NCTSPA defines "misappropriation" as "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." N.C. Gen. Stat. § 66-152(1). In other words, "[m]isappropriation occurs when defendant acquires, discloses, or uses another's trade secret without the owner's consent or authority." SciGrip, Inc. v. Osae, 2018 NCBC LEXIS 10, at *16 (N.C. Super. Ct. Jan. 30, 2018) ("SciGrip I"), aff'd, 838 S.E.2d 334 (N.C. 2020). Thus, the *lex loci* in trade secret cases is where the misappropriation occurred. SciGrip II, 838 S.E.2d at 343–44.

Here, SPP's misappropriation claim is based on allegations that after executing the MEA, Geisman disclosed and used SPP's trade secrets without authorization or consent.[3] SPP does not allege, however, any misappropriation that occurred in North Carolina. For example, SPP alleges that on July 10, 2018 (pre-MEA), Geisman gave a presentation at the Massachusetts Institute of Technology that used SPP's confidential information and trade secrets. (Doc. No. 1, ¶ 65.) SPP alleges that Geisman misappropriated SPP's trade secrets on July 23, 2018 (post-MEA) when he sent a copy of the presentation to an individual who attended the presentation. (Doc. No. 1, ¶ 65.) SPP also alleges that Geisman wrongfully disclosed SPP's trade secrets by sending certain email attachments to a software company

---

[3] To the extent SPP attempts to base its trade secrets claim on allegations that prior to the MEA, Geisman wrongfully took files containing SPP's trade secrets, the claim is barred by the release in the MEA.

located in Australia. (Doc. No. 1, ¶ 86.) The only other specific allegation of post-MEA misappropriation is Geisman's discussion on a podcast during which he allegedly disclosed trade secrets, but there are no allegations to suggest that this occurred in North Carolina in any way. (Doc. No. 1, ¶¶ 67–68.)

SPP does not argue that any alleged misappropriation occurred in North Carolina. Instead, SPP argues that "Geisman's conduct is inextricably intertwined with the State of North Carolina," arguing that SPP is a North Carolina entity who was injured in North Carolina and whose trade secrets are located in and controlled from North Carolina. (Doc. No. 26, at 19–21.) This is insufficient. As the alleged misappropriation occurred outside North Carolina, the NCTSPA does not apply. SciGrip II, 838 S.E.2d at 346 (affirming summary judgment in favor of defendants on plaintiff's NCTSPA claim where the misappropriation occurred outside North Carolina); Domtar AI Inc. v. J.D. Irving, Ltd., 43 F. Supp. 3d 635, 641 (E.D.N.C. 2014) (granting judgment on the pleadings in favor of defendants on plaintiffs' NCTSPA claim where the alleged misappropriation occurred outside North Carolina). SPP's claim under the NCTSPA for misappropriation of trade secrets is dismissed.[4]

### D. Misappropriation of Trade Secrets Under the DTSA

SPP also brings a claim under the DTSA for misappropriation of trade secrets. Geisman argues that to plead a claim for misappropriation of trade secrets, "a

---

[4] To the extent that SPP also asserts a common law claim for misappropriation of trade secrets, such claim is likewise dismissed. RoundPoint Mortg. Co. v. Florez, 2016 NCBC LEXIS 18, at *43 (N.C. Super. Ct. Feb. 18, 2016) (stating that "[n]o North Carolina court has acknowledged the existence of" a common law claim for misappropriation of trade secrets).

plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." (Doc. No. 21, at 16–17.) Geisman contends that SPP fails to state a claim under the DTSA because the complaint does not identify the alleged trade secrets with sufficient particularity, and one cannot discern from the complaint the specific trade secrets that SPP alleges Geisman used or disclosed.

SPP argues that the complaint identifies the trade secrets with sufficient particularity to enable Geisman to delineate that which he is accused of misappropriating. SPP points to paragraph 50 of the complaint, which identifies as trade secrets various designs, algorithms, and calculators that SPP alleges Geisman downloaded on June 14, 2018. As SPP released all claims it had against Geisman as of July 15, 2018—whether known or unknown—this alleged June 14, 2018 download of SPP's trade secrets cannot serve as the basis for SPP's claim under the DTSA. The complaint's allegations as to post-MEA misappropriation do not identify with any specificity the trade secrets that Geisman allegedly used or disclosed. In arguing that its trade secrets have been sufficiently identified, SPP points to evidence that it submitted in connection with its motion for a preliminary injunction, but the Court cannot consider that extrinsic evidence in ruling on Geisman's motion to dismiss. Accordingly, the Court dismisses SPP's claim under the DTSA for misappropriation of trade secrets without prejudice to filing an amended complaint that sufficiently identifies the trade secrets that Geisman allegedly misappropriated post-MEA.

E.     Unfair or Deceptive Acts or Practices

A claim for unfair or deceptive acts or practices under N.C. Gen. Stat. § 75-1.1 requires "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." Walker v. Fleetwood Homes of N.C., Inc., 653 S.E.2d 393, 399 (N.C. 2007). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Hills Mach. Co., LLC v. Pea Creek Mine, LLC, 828 S.E.2d 709, 716 (N.C. Ct. App. 2019) (quoting Marshall v. Miller, 276 S.E.2d 397, 403 (N.C. 1981)). "[A] practice is deceptive if it has the capacity or tendency to deceive." Walker, 653 S.E.2d at 399 (alteration in original) (quoting Marshall, 276 S.E.2d at 403). "The determination as to whether an act is unfair or deceptive is a question of law for the court." Dalton v. Camp, 548 S.E.2d 704, 711 (N.C. 2001).

Geisman argues that because SPP's trade secrets claims fail, SPP's claim for unfair or deceptive acts or practices should be dismissed. "In general, a mere breach of contract, even if intentional, is not considered an unfair or deceptive trade practice under § 75-1.1." Interstate Narrow Fabrics, Inc. v. Century USA, Inc., 218 F.R.D. 455, 465 (M.D.N.C. 2003). "Egregious or aggravating circumstances must be alleged before the provisions of [§ 75-1.1] may take effect." Becker v. Graber Builders, Inc., 561 S.E.2d 905, 910 (N.C. Ct. App. 2002). "Aggravating circumstances include conduct of the breaching party that is deceptive." Ellis v. Louisiana-Pacific Corp., 699 F.3d 778, 787 (4th Cir. 2012). In addition, "unfairness or deception either in the

25

formation of the contract or in the circumstances of its breach may establish the existence of substantial aggravating circumstances sufficient to support an unfair and deceptive trade practices claim." <u>SciGrip II</u>, 838 S.E.2d at 347 (quotation marks omitted). "Further, a breach of contract can constitute an unfair or deceptive trade practice if the promisor enters into the contract with no intent to perform under the contract." <u>Interstate Narrow Fabrics</u>, 218 F.R.D. at 465.

SPP has sufficiently alleged deceptive conduct surrounding the MEA to survive a motion to dismiss. SPP alleges that on multiple occasions, Geisman took SPP files containing confidential information while misrepresenting to SPP that he was not doing so. In addition, SPP alleges that five days before executing the MEA—which prohibits Geisman from using or disclosing SPP's proprietary and confidential information—Geisman sent an email to his brother-in-law stating that he "could re-create the substance of any SPP [intellectual property]" and that he "certainly won't broadcast that but for use with clients (suitably restricted), what do you think?" (Doc. No. 1, ¶ 54.) These allegations sufficiently plead deceptive conduct to survive a motion to dismiss.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that:

1.  The Court declines to adopt the M&R, (Doc. No. 35);

2.  Defendant's motion to dismiss for lack of personal jurisdiction, (Doc. No. 18), is **DENIED**; and

3.  Defendant's motion to dismiss for failure to state a claim, (Doc. No. 20),

is **GRANTED in part** and **DENIED in part**:

a.   The motion is granted as to SPP's claim for breach of the MEA to the extent it is based on the non-competition provision (paragraph 17(b)), non-solicitation provision (paragraph 17(d)), company intellectual property provision (paragraph 18), and related provision restricting Geisman's ability to teach, write papers, and engage in other similar activities (paragraph 17(e)), and these portions of the claim are dismissed.

b.   The motion is granted as to SPP's claim under the NCTSPA for misappropriation of trade secrets, and this claim is dismissed.

c.   The motion is granted as to SPP's claim under the DTSA for misappropriation of trade secrets, and this claim is dismissed without prejudice.

d.   The motion is denied as to SPP's claim for unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1.

Signed: June 16, 2020

Robert J. Conrad, Jr.
United States District Judge