# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
### 3:19-cv-00195-RJC-DCK

| | | |
|---|---|---|
| SOFTWARE PRICING PARTNERS, LLC | ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | **ORDER** |
| JAMES H. GEISMAN, | ) ) ) | |
| Defendant. | ) ) ) | |

 **THIS MATTER** comes before the Court on Plaintiff's Motion for Default Judgement (Doc. No. 85).

## I. BACKGROUND

### A. Factual Background

 Plaintiff Software Pricing Partners, LLC ("Plaintiff" or "SPP") provides software companies with pricing tactics, program and project management solutions, and project deployment services used to help increase a company's overall profitability and improve its growth. (Doc. No. 57 ¶ 11). To that end, SPP developed its own confidential information and trade secrets in the form of unique algorithms, formulae, approaches, frameworks, and insights for software companies to deploy complex tailored licensing, packaging, pricing, and discounting models into their operations. (*Id.* ¶¶ 12, 21).

 In June 2015, Chris Mele and Defendant Geisman formed SPP. (*Id.* ¶ 14). When formed, SPP acquired all intellectual property from Geisman and the now-dissolved Software Pricing Partners, Inc., an entity Geisman owned. (*Id.* ¶¶ 15-16). In their roles at SPP, Geisman, and Mele

spent considerable time developing innovative tools, formulae, and techniques for building pricing and licensing models and packaging software features. (*Id.* ¶ 22). A handwritten formula developed by Mele and Geisman is at the heart of SPP's business. (Doc. No. 22 at 44-48). During this time, Geisman had access to SPP's confidential information and trade secrets, and regularly relied on this information to perform work for SPP. (Doc. No. 57 ¶ 23).

In March 2018, SPP and Geisman began discussing Geisman's exit from SPP. (*Id.* ¶ 33). The discussions ultimately culminated in a Member Exit Agreement ("MEA") between SPP, Mele, and Geisman, executed on July 15, 2018. (*Id.* ¶ 36; Doc. No. 57-2). Pursuant to the MEA, Geisman gave up his membership interest in the SPP and resigned. (Doc. No. 57-2 at 2). The Court previously concluded the following MEA provisions are unenforceable as a matter of law: non-competition provision (paragraph 17(b)), non-solicitation provision (paragraph 17(d)), company intellectual property provision (paragraph 18), and related provision restricting Geisman's ability to teach, write papers, and engage in other similar activities (paragraph 17(e)). (Doc. No. 40). In addition to the unenforceable provisions, the MEA contains confidentiality provisions and protection of SPP's name and logo.

While negotiations regarding Geisman's exit were ongoing, on numerous occasions Geisman copied SPP's confidential information and trade secrets to Geisman's personal laptop, despite denying it to SPP and Mele. (Doc. No. 57 ¶ 44). SPP provided a list of 134 files that Geisman took from SPP, containing specific trade secrets. (*Id.* ¶ 50; Doc. No. 57-3). Also during negotiations, Geisman stated in an email to his brother-in-law on July 10, 2018: "[w]ith my knowledge I could re-create the substance of any SPP IP. I certainly won't broadcast that but for use with clients (suitably restricted), what do you think?" (*Id.* ¶ 57). In October 2018, after Geisman executed the MEA, Geisman attempted to access SPP's files again. (*Id.* ¶ 58).

After exiting SPP, Geisman used and disclosed SPP's trade secrets and confidential information for his own gain and in competition with SPP. (*Id.* ¶¶ 66-67). Geisman solicited SPP's customers and intercepted leads from SPP. (*Id.* ¶¶ 84-86). For example, on July 23, 2018, Geisman sent a presentation containing SPP's confidential information to a third party. (*Id.* ¶ 70). On October 4, 2018, Geisman provided PowerPoint slides to a third party for a presentation that included SPP's information and logo. (*Id.* ¶ 89). On October 29, 2018, Geisman sent an email to four people which included a confidential SPP spreadsheet. (*Id.* ¶ 91). Geisman also sent SPP's trade secret algorithms and non-sanitized confidential spreadsheets to VideoMyJob, an Australian software company. (*Id.* ¶¶ 92-93; Doc. No. 22 at 59-68). On March 4, 2019, on a podcast, Geisman held himself out to be the "founder and president of SPP" and disclosed SPP's confidential information. (Doc. No. 57 ¶¶ 72-73). Geisman also copied, distributed, and altered SPP's copyright materials without SPP's consent. (*Id.* ¶¶ 97-104).

During the course of this litigation, in 2020, SPP discovered at least 11,150 known SPP documents on Geisman's laptop, at least 11,200 known SPP documents on Geisman's external hard drive, and at least 730 known SPP documents on Geisman's backup drive. (*Id.* ¶ 51). These files include: (1) SPP's files from over 210 completed projects with SPP's clients;[1] (2) over 340 files from dozens of failed client proposals; (3) at least 250 critical files to SPP's business contained in a single directory; and (4) at least 1,600 files from SPP's workshop presentations. (*Id.*). Geisman has all of SPP's information that gives SPP a competitive edge in the market. (Doc. No. 5-1 ¶ 30).

---

[1] Including presentations to clients, invoices to clients, working and final spreadsheets developed for those clients, and tools SPP developed for use with these clients. (Doc. No. 57 ¶ 51).

## B. Procedural Background

On April 19, 2019, SPP filed its Complaint in this Court against Geisman alleging he misappropriated confidential information and trade secrets. In May 2019, SPP also filed a Motion for Preliminary Injunction. (Doc. Nos. 4 & 5). The Court entered a limited preliminary injunction that required Geisman to delete from his computer and not to use or disclose the contents of certain 224 files Geisman allegedly copied. (Doc. No. 32). Thereafter, on a motion to dismiss, the Court dismissed SPP's claims as follows: (1) claim for breach of the MEA to the extent it is based on the non-competition provision, non-solicitation provision, company intellectual property provision, and related provisions restricting Geisman's ability to teach, write papers, and engage in other similar activities because they are unenforceable as a matter of law; (2) trade secret misappropriation under North Carolina Trade Secrets Protection Act and common law because the alleged misappropriation occurred outside of North Carolina; and (3) trade secret misappropriation under the Defend Trade Secrets Act ("DTSA") without prejudice to file an amended complaint because the Complaint did not identify with any specificity the trade secrets that Geisman allegedly used or disclosed. (Doc. No. 40). The Court also noted that SPP released all claims it had against Geisman as of July 15, 2018—whether known or unknown—such that alleged misappropriation, use, or disclosure of confidential information and trade secrets prior to July 15, 2018, cannot support SPP's claims. (Doc. No. 40 at 24).

On May 12, 2021, SPP filed the operative Second Amended Complaint asserting claims for: (1) breach of the MEA; (2) misappropriation of trade secrets under the Massachusetts Trade Secrets Act ("MTSA"); (3) misappropriation of trade secrets under the DTSA; (4) copyright infringement in violation of 17 U.S.C. § 501; (5) copyright infringement in violation of the Digital Millennium Copyright Act ("DMCA") under 17 U.S.C. § 1202; and (6) Unfair and Deceptive Trade Practices under N.C. Gen. Stat. § 75-1.1. During discovery, in July 2021, Geisman filed a

Chapter 13 bankruptcy case in the United States Bankruptcy Court for the District of Massachusetts. (Doc. No. 57). The bankruptcy case stayed this action until SPP received relief from the automatic stay to continue litigating this case. Thereafter, the Court held a status conference at which Geisman indicated he is "unable to continue to defend against the allegations in this lawsuit" and would agree to an entry of default "to be proactive . . . in lieu of becoming an unresponsive party." (Doc. No. 81). The Clerk of Court entered a default on April 18, 2022, after which SPP filed its Motion for Default Judgment requesting a permanent injunction, damages including treble damages, and attorneys' fees. (Doc. Nos. 83, 85). Geisman contests the scope of the permanent injunction and amount of damages requested. (Doc. No. 88).

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 55, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Upon the entry of default, the defaulted party is deemed to have admitted all well pleaded allegations of fact contained in the complaint. *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001); *Weft, Inc. v. GC Inv. Assocs.*, 630 F. Supp. 1138, 1141 (E.D.N.C. 1986). However, the defendant is not deemed to have admitted conclusions of law and the entry of  "default is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover." *Ryan*, 253 F.3d at 780 (citations omitted); *see also E.E.O.C. v. Carter Behavior Health Servs., Inc.*, No. 4:09-cv-122-F, 2011 WL 5325485, at *3 (E.D.N.C. Oct. 7, 2011). Rather, in determining whether to enter judgment on the default, the court must determine whether the well pleaded allegations in the complaint support the relief sought. *Ryan*, 253 F.3d at 780 (citing *Weft*, 630 F. Supp. at 1141); *DIRECTV, Inc. v. Pernites*, 200 F. App'x 257, 258 (4th Cir. 2006) ("[A] defendant is not held to admit facts that are not well pleaded or to admit conclusions of law.").

"If the court finds that liability is established, it must then determine damages." *Carter Behavior Health*, 2011 WL 5325485, at *4 (citing *Ryan*, 253 F.3d at 780-81). "The court must make an independent determination regarding damages, and cannot accept as true factual allegations of damages." *Id.* (citations omitted). While the court may conduct an evidentiary hearing to determine damages, it is not required to do so, and instead may rely on affidavits or documentary evidence in the record to determine the appropriate sum. *EEOC v. CDG Mgmt., LLC*, No. RDB-08-2562, 2010 WL 4904440, at *2 (D. Md. Nov. 24, 2010) (citations omitted); *EEOC v. North Am. Land Corp.*, No. 1:08-cv-501, 2010 WL 2723727, at *2 (W.D.N.C. Jul. 8, 2010).

## III.  DISCUSSION

### A.  Liability

First, the Court must determine whether SPP's allegations establish liability. Geisman does not appear to contest liability, but contests the scope of the relief SPP requests. As discussed below, Geisman is liable for the claims SPP brings against him.

#### 1.  Breach of the Member Exit Agreement

SPP asserts that Geisman breached his obligations under the MEA's "Confidentiality" and "Use of Name and Logos of Company" provisions. Under North Carolina law, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Johnson v. Colonial Life & Accident Ins. Co.*, 618 S.E.2d 867, 870 (N.C. Ct. App. 2005). "To be enforceable, a covenant must, among other things, be reasonable as to time, territory, and scope of activity." *Asheboro Paper & Packaging, Inc. v. Dickinson*, 599 F. Supp. 2d 664, 671 (M.D.N.C. 2009). To be reasonable, "the restrictions must be no wider in scope than

is necessary to protect the business of the [promisee]."  *Medical Staffing Network, Inc. v. Ridgway*, 670 S.E.2d 321, 327 (N.C. Ct. App. 2009) (quotation marks omitted).

First, the MEA's confidentiality provision provides:

> 19.    Confidentiality.  Geisman (a) shall protect, and shall use his reasonable efforts to cause his Affiliates, accountants, representatives, agents and advisors to protect, the confidentiality of all proprietary and confidential information relating to the assets and business of the Company, and (b) shall not disclose, and shall use his reasonable efforts to cause his Affiliates, accountants, representatives, agents and advisors not to disclose, such proprietary and confidential information to any other Person;

(Doc. No. 57-2 at 9).  The Court previously held this provision is valid and enforceable.  (Doc. No. 40 at 21).  The confidentiality provision requires Geisman to protect and not to disclose SPP's "proprietary and confidential information to any other Person."  (Doc. No. 57-2 at 9).  Geisman breached this provision on multiple occasions when he sent SPP PowerPoint slides containing confidential information to third parties, sent SPP spreadsheets containing confidential information to third parties, and shared SPP's confidential information on a podcast.  (Doc. No. 57 ¶¶ 70-73, 89, 91-93, 103).  Geisman disclosed SPP's confidential information with third parties, without SPP's consent, and is liable for breaching the MEA's confidentiality provision.

Next, Section 21 of the MEA provides:

> 21.    Use of Name and Logos of Company.  Geisman shall not use the name "Software Pricing Partners", the abbreviation "SPP" or any of the trademarks, trade names or logos of the Company, or any derivation thereof, without the express written consent of the Company.

(Doc. No. 57-2 at 9).  This provision is valid and enforceable because protecting SPP's name and logo is a "legitimate business interest."  *Chemimetals Processing*, 476 S.E.2d 374, 377 (N.C. Ct. App. 1996) (citation omitted).  Geisman breached this provision when he sent PowerPoint slides that contained SPP's name and logo to a third party without SPP's consent and breached the MEA's use of name and logos provision.

Accordingly, Geisman is liable for breaching the MEA's confidentiality and use of name and logos provisions.

## 2. Misappropriation of Trade Secrets

The elements of a claim under the MTSA are "(1) the information is a trade secret; (2) the plaintiff 'took reasonable steps to preserve the secrecy of the information'; and (3) 'the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret.'" *Moog, Inc. v. ClearMotion, Inc.*, No. 1:19-cv-12066-IT, 2020 U.S. Dist. LEXIS 194913, at *20 (D. Mass. Oct. 21, 2020) (quoting *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007)). Massachusetts law defines a trade secret as "specified or specifiable information . . . including but not limited to a formula, pattern, compilation, program, device, method, technique, process, business strategy, customer list, invention, or scientific, technical, financial or customer data." Mass. Gen. Laws Ann. ch. 93, § 42(4).

Under the DTSA, the plaintiff must show "(1) that he holds a trade secret, (2) that the trade secret was misappropriated, and (3) that the trade secret implicates interstate or foreign commerce." *Hunter Structural, P.A. v. Arp Eng'g, Inc.*, No. 3:17-cv-00086, 2018 U.S. Dist. LEXIS 16171, at *15 (W.D.N.C. Feb. 1, 2018) (citing 18 U.S.C. § 1836(b)(1)). Under the DTSA, a trade secret is defined as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if –
>
> > (A) the owner thereof has taken reasonable measures to keep such information secret; and
> >
> > (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily

ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). Misappropriation means "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent . . . ." 18 U.S.C. § 1839(5).

SPP asserts the following categories of information are trades secrets which Geisman misappropriated:

- The 134 specific SPP files, with specific compilations, algorithms, layouts, techniques, and processes that SPP uses for monetization (Doc. No. 57 ¶ 50; Doc. No. 57-3);

- SPP's proprietary methodology that it uses to create software solutions for its clients, which contains proprietary licensing, packaging, and pricing tools designed to monetize software products and related services (Doc. No. 57 ¶ 52);

- SPP's proprietary algorithms and formulas (*Id.*); and

- SPP's pricing/discounting curve, which is a complex mathematical formula used throughout SPP's operations (*Id.*).

First, SPP sufficiently specifies the trade secrets in each of the 134 specific files that Geisman retained and the specific mathematical formula underlying SPP's pricing/discounting curve. (Doc. No. 57 ¶ 50; Doc. No. 57-3; Doc. No. 22 at 44-48). However, the remaining categories of information, to the extent not contained in the 134 specific SPP files, broadly describe categories of information without providing sufficient particularity for the Court to delineate the specific trade secrets misappropriated as opposed to broad categories of information. Next, SPP took reasonable measures to keep its trade secrets confidential. (Doc. No. 57 ¶¶ 24-30). Further, the trade secrets implicate interstate and foreign commerce because SPP uses the trade secrets with clients around the country and Geisman provided SPP's trade secrets to an Australian software company. (Doc. No. 57 ¶¶ 92-93). Finally, Geisman misappropriated SPP's trade secrets when,

post-MEA, he used and disclosed SPP's trade secrets without consent when he shared trade secrets with VideoMyJob. Accordingly, Geisman is liable for misappropriation of trade secrets under the MTSA and DTSA.

### 3. Copyright Infringement

SPP asserts a claim for copyright infringement, alleging that Geisman violated its rights for any Registrations not deemed confidential as part of its misappropriation claims and/or UDTPA claim. To prove copyright infringement, a plaintiff must show that: (1) he or she owned the copyright to the work that was allegedly copied; and (2) the defendant copied protected elements of that work. *Levi v. Twentieth Century Fox Film Corp.*, No. 3:16CV129, 2018 WL 1542239 at *3 (E.D. Va. Mar. 29, 2018) (citing *Towler v. Sayles*, 76 F.3d 579, 581 (4th Cir. 1996)). A plaintiff may prove copying "through indirect evidence by establishing that: (1) 'the defendant had access to the copyrighted work;' and, (2) 'the defendant's work is substantially similar to the protected material.'" *Id.* at *4 (quoting *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 801 (4th Cir. 2001)). To prove access, a plaintiff must show that it was "reasonably possible" that the defendant "'had an opportunity to view or to copy' the copyrighted work." *Id.* (quoting *Towler*, 76 F.3d at 582). SPP has exclusive rights to eight registrations. (Doc. No. 57 ¶ 97). Geisman had access to SPP's copyrighted materials when he worked at SPP and retained SPP's documents upon leaving. (Doc. 57 ¶ 150-51). On multiple occasions after leaving SPP, Geisman sent either an exact copy of one of SPP's copyrighted documents or an altered copy of said documents to third parties. (Doc 57 ¶¶ 101-03). Accordingly, Geisman is liable for copyright infringement.

### 4. Violation of the Digital Millennium Copyright Act

A DMCA violation occurs when a defendant, "knowingly and with the intent to induce, enable, or facilitate, or conceal infringement" provides or distributes copyright management

information that is false.  17 U.S.C. § 1202(a).  Additionally, a DMCA violation occurs when a person, without a copyright owner's permission, either "intentionally remove[s] or alter[s] any copyright management information" or distributes a copyrighted work "knowing that copyright management information has been removed or altered." 17 U.S.C. § 1202(b).  Here, Geisman altered SPP's copyrighted documents by removing indications of the copyright or otherwise altering the documents prior to distributing to customers. (Doc. No. 57 ¶¶ 101-104).  Geisman, as a former employee of SPP, reasonably knew that such information was copyrighted work and knew he was altering it by changing it enough to look like his own work while maintaining a substantial similarity to the original work.  Accordingly, Geisman is liable for violating the DMCA.

### 5.  Unfair and Deceptive Trade Practices

A claim for unfair or deceptive acts or practices under N.C. Gen. Stat. § 75-1.1 requires "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." *Walker v. Fleetwood Homes of N.C., Inc.*, 653 S.E.2d 393, 399 (N.C. 2007).  "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Hills Mach. Co., LLC v. Pea Creek Mine, LLC*, 828 S.E.2d 709, 716 (N.C. Ct. App. 2019) (quoting *Marshall v. Miller*, 276 S.E.2d 397, 403 (N.C. 1981)).  "[A] practice is deceptive if it has the capacity or tendency to deceive." *Walker*, 653 S.E.2d at 399 (alteration in original) (quoting *Marshall*, 276 S.E.2d at 403).  "The determination as to whether an act is unfair or deceptive is a question of law for the court." *Dalton v. Camp*, 548 S.E.2d 704, 711 (N.C. 2001).

"In general, a mere breach of contract, even if intentional, is not considered an unfair or deceptive trade practice under § 75-1.1." *Interstate Narrow Fabrics, Inc. v. Century USA, Inc.*,

218 F.R.D. 455, 465 (M.D.N.C. 2003). "Egregious or aggravating circumstances must be alleged before the provisions of [§ 75-1.1] may take effect." *Becker v. Graber Builders, Inc.*, 561 S.E.2d 905, 910 (N.C. Ct. App. 2002). "Aggravating circumstances include conduct of the breaching party that is deceptive." *Ellis v. Louisiana-Pacific Corp.*, 699 F.3d 778, 787 (4th Cir. 2012). In addition, "unfairness or deception either in the formation of the contract or in the circumstances of its breach may establish the existence of substantial aggravating circumstances sufficient to support an unfair and deceptive trade practices claim." *SciGrip II*, 838 S.E.2d at 347 (quotation marks omitted). "Further, a breach of contract can constitute an unfair or deceptive trade practice if the promisor enters into the contract with no intent to perform under the contract." *Interstate Narrow Fabrics*, 218 F.R.D. at 465. Misappropriation of trade secrets may form the basis of a claim under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 et seq., if the misappropriation satisfies the three required elements form an unfair trade practices claim." *Am. Air Filter Co. v. Price*, 2018 NCBC LEXIS 73 (July 10, 2018).

Geisman misappropriated SPP files containing confidential information and trade secrets while misrepresenting to SPP that he was not doing so. In addition, five days before executing the MEA Geisman sent an email to his brother-in-law stating that he "could re-create the substance of any SPP [intellectual property]" and that he "certainly won't broadcast that but for use with clients (suitably restricted), what do you think?" (Doc. No. 57 ¶ 57). After exiting SPP, Geisman used and disclosed the information he improperly took and continued to misrepresent to SPP that he did not retain such information. (*Id.* ¶¶ 66-67, 84-86). Even during the course of this litigation, SPP found thousands of its documents on Geisman's personal laptop, hard drive, and backup drive. (*Id.* ¶ 51). These actions, when entering into the MEA and thereafter, were deceptive. Further,

Geisman's actions affected commerce and caused injury to SPP. Accordingly, Geisman is liable for unfair or deceptive acts or practices.

### B. Permanent Injunction

SPP asks the Court to permanently enjoin Geisman from using or disclosing any of the more than 11,000 documents or files he has from SPP and using or disclosing any information or knowledge Geisman retains from his time at SPP, including information that resides solely in Geisman's head.

Injunctive relief is available in a default judgment setting, is contemplated under the MEA, and is an available remedy under the claims SPP brings. *Title Trading Srvcs., USA, Inc. v. Kundu*, No. 3:14-CV-225-RJC-DCK, 2016 WL 608193 at *7 (W.D.N.C. Jan. 5, 2016). "Permanent injunctive relief is appropriate where a plaintiff demonstrates that (1) it has suffered irreparable injury; (2) there is no adequate remedy at law; (3) the balance of hardship favors an equitable remedy; and (4) an issuance of an injunction is in the public's interest." *Title Trading*, 2016 WL 608193 at *7 (citing *eBay, Inc. v. MercExchange*, LLC, 547 U.S. 388, 392-93 (2006)). "It is well established that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *PBM Prod., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 128 (4th Cir. 2011) (quoting *Kentuckians for Commonwealth v. Rivenburgh,* 317 F.3d 425, 436 (4th Cir.2003). "[I]n most instances, courts presume irreparable harm where a trade secret has been misappropriated." *Merck & Co. Inc. v. Lyon*, 941 F. Supp. 1443, 1455 (M.D.N.C. 1996) (citing *Lumex, Inc. v. Highsmith,* 919 F. Supp. 624, 628 (E.D.N.Y.1996)). SPP is entitled to permanent injunctive relief here.

1. Copyright Material

"Any court having jurisdiction of a civil action arising under this title may, subject to the provisions of section 1498 of title 28, grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). Under the Copyright Act and the MEA, SPP is entitled to protection of its copyrighted material, trademarks, logos, and copyright management information. Accordingly, Geisman is permanently enjoined from using and/or altering for use SPP's name or any trademarks, logos, or other registered copyrights.

2. Confidential Information

SPP asks the Court to enjoin Geisman from using or disclosing information contained in more than 11,000 files found on Geisman's personal laptop, external hard drive, and backup drive. As an initial matter, the MEA protects confidential information and only restricts Geisman from disclosing confidential information. The plain language of the MEA does not prohibit Geisman from using confidential information. (Doc. No. 57-2 at 9). The parties agreed to this provision and the Court will not expand its terms.

Next, SPP has not sufficiently shown why or how all of the over 11,000 files it seeks to enjoin Geisman from disclosing contain confidential information. The Court will specifically enjoin Geisman from disclosing the following files SPP identified within the more than 11,000 files: (1) SPP's files from over 210 completed projects with SPP's clients; (2) the over 340 files from dozens of failed client proposals; (3) the at least 250 critical files to SPP's business contained in a single directory; and (4) the at least 1,600 files from SPP's workshop presentations. (Doc. No. 57 ¶ 51). Additionally, to the extent the over 11,000 files contain additional confidential information Geisman is enjoined from disclosing such confidential information. However, the

Court will not prevent Geisman from disclosing public information in which SPP has no protectable interest. (Doc. No. 40 at 20).

Finally, the Court will not enjoin Geisman from using the knowledge, skills, and experience he holds solely within his own head which request the Court finds overly broad, except those categories of information the Court determines are trade secrets as discussed below. *See Travenol Labs., Inc. v. Turner*, 228 S.E.2d 478 (1976) (holding that an injunction restricting misappropriation of trade secrets should not be "so broad that the defendant [former employee] may be deprived of the right to use his own skills and talents in this work for [the new employer]"); *Engineering Associates, Inc. v. Pankow*, 268 N.C. 137, 139, 150 S.E.2d 56 (1966) ("[W]here a person in his new employment undertakes to use the knowledge acquired in the old, it is not unlawful, for equity has no power to compel a man who changes employers to wipe clean the slate of his memory."); *Bldg. Ctr., Inc. v. Carter Lumber of N., Inc.,* No. 16 CVS 4186, 2017 WL 4225861, at *8 (N.C. Super. Sept. 21, 2017); *FMC Corp. v. Cyprus Foote Mineral Co.*, 899 F. Supp. 1477, 1483 (W.D.N.C. 1995) ("The mere fact that Fickling acquired some of these skills while working for FMC does not mean that he must work for FMC or not work at all."); *RLM Commc'ns, Inc. v. Tuschen*, 66 F. Supp. 3d 681, 696 (E.D.N.C. 2014) ("Acquiring and using such knowledge and experience . . . does not constitute misappropriation of trade secrets."), *aff'd*, 831 F.3d 190 (4th Cir. 2016); *Thoroughbred Ventures, LLC v. Disman*, No. 4:18-CV-00318, 2018 WL 3752852, at *4 (E.D. Tex. Aug. 8, 2018) ("Thoroughbred is not entitled to an injunction with respect to disclosure of information committed to memory.").

3. Trade Secrets

Geisman is liable for misappropriating the 134 specific files enumerated in SPP's Second Amended Complaint (including any information, formulae, algorithms, etc. contained within those

files) and the specific mathematical formula underlying SPP's pricing/discounting curve. Geisman is enjoined from using, disclosing, or disseminating this information including the 134 files, any information contained within these 134 files, the specific mathematical formula underlying SPP's pricing/discounting curve, and any underlying notes concerning the mathematical formula. Geisman is enjoined from using, disclosing, or disseminating this specific information even if the specific trade secrets is known by memory or in his head, but is not enjoined from using the knowledge, skills, and experience he holds solely within his own head as long as he does not use the specific trade secrets enumerated above. For example, Geisman is enjoined from using the specific mathematical formula underlying SPP's pricing/discounting curve, but he is not enjoined from using his knowledge and skills to develop other mathematical formulas.

### 4. Parameters of Permanent Injunction

In sum, Geisman is permanently enjoined from:

- Using and/or altering for use SPP's name or any trademarks, trade names, logos, or any of its other registered copyrights or copyright management information as defined in the DMCA, including:

  - Using the name "Software Pricing Partners," the abbreviation "SPP," or any of the trademarks, trade names or logos of SPP, or any derivation thereof;

  - Removing or altering any of SPP's copyright management information as defined in the DMCA; and

  - Reproducing, altering, preparing derivative works, distributing, performing, or displaying any of SPP's copyrighted works;

- Disclosing any confidential information that is not otherwise known or available to individuals or companies other than SPP and/or its current and former principals, employees, and agents, including any confidential information in the over 11,000 SPP files on Geisman's personal laptop, external hard drive, and backup hard drive, and specifically including but not limited to:

  - SPP's files from over 210 completed projects with SPP's clients;

- o The over 340 files from dozens of failed client proposals;

- o The at least 250 critical files to SPP's business contained in a single directory; and

- o The at least 1,600 files from SPP's workshop presentations;  and

- Using, disclosing, or disseminating the 134 specific files enumerated in SPP's Complaint (including any information, formulae, algorithms, etc. contained within those files) and the specific mathematical formula underlying SPP's pricing/discounting curve (including any underlying notes concerning the mathematical formula), even if the information is known by memory or in Geisman's head.  Geisman must return or destroy all 134 files that contain trade secrets, the mathematical formula, and any underlying notes concerning the mathematical formula.

Geisman is not enjoined from disclosing public information in which SPP has no protectable interest, even if contained in the over 11,000 SPP files on Geisman's personal laptop, external hard drive, and backup hard drive.  Finally, Geisman is not enjoined from using the knowledge, skills, and experience he holds solely within his own head, except the specific trade secrets.

### C.  Damages

In total, SPP requests damages in the amount of $3,845,573, plus an undetermined amount for attorneys' fees and costs.

#### 1.  All Claims Except DMCA

Under the DTSA and MTSA, a plaintiff is entitled to: (1) damages for actual loss caused by the misappropriation and for unjust enrichment caused by the misappropriation that is not addressed in computing damages for actual loss; or (2) a reasonable royalty for the unauthorized disclosure or use of the trade secret.  18 U.S.C. § 1836(b)(3)(B); Mass. Gen. Laws ch. 93 § 42B.

In determining damages for misappropriation of a trade secret, "the value of the secret to the plaintiff is an appropriate measure of damages only when the defendant has in some way

destroyed the value of the secret." *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 535 (5th Cir. 1974) ("The most obvious way this is done is through publication, so that no secret remains."). "Where the plaintiff retains the use of the secret, . . . and where there has been no effective disclosure of the secret through publication[,] the total value of the secret to the plaintiff is an inappropriate measure." *Id.* "When a misappropriated trade secret is used in direct competition against the owner of the trade secret, and the profits or losses of the owner are concretely measurable, courts typically calculate damages based on either the plaintiff lost profits or the defendant illicit gains." *Title Trading*, 2016 WL 608193 at *9; *see also Univ. Computing Co.*, 504 F.2d at 536 ("An 'appropriate measure of damages . . . is not what plaintiff lost, but rather the benefits, profits, or advantages gained by the defendant in the use of the trade secret.'" (quoting *Int'l Indus., Inc. v. Warren Petroleum Corp.*, 248 F.2d 696, 699 (3d Cir. 1957)).

Alternatively, courts can award a reasonable royalty. "Case law addressing royalty damages for misappropriating trade secrets is sparse" and there is "no one-size-fits-all approach to calculating reasonable royalty damages." *AirFacts, Inc. v. Amezaga*, 30 F.4th 359, 367, 369 (4th Cir. 2022). "[E]very case requires a flexible and imaginative approach." *Id.* at 369. "[W]hen 'the secret has not been destroyed' and 'the plaintiff is unable to prove specific injury,' courts can calculate reasonable royalty damages by 'measur[ing] the value of the secret to the defendant.'" *Id.* at 367-68 (quoting *Univ. Computing Co.*, 504 F.2d 518)).

> [B]ecause the primary concern in most cases is to measure the value to the defendant of what he actually obtained from the plaintiff, the proper measure is to calculate what the parties would have agreed to as a fair price for licensing the defendant to put the trade secret to the use the defendant intended at the time the misappropriation took place.

*Id.* at 368. In determining a fair licensing price, court may consider various factors including the following:

> [(1)] the resulting and foreseeable changes in the parties' competitive posture; [(2)] th[e] prices past purchasers or licensees may have paid; [(3)] the total value of the secret to the plaintiff, including the plaintiff's development costs and the importance of the secret to the plaintiff's business; [(4)] the nature and extent of the use the defendant intended for the secret; and [(5)] finally whatever other unique factors in the particular case which might have affected the parties' agreement, such as the ready availability of alternative processes.

*Id.* at 369.

Here, to the extent SPP seeks actual damages, a calculation based on the value of all of its trade secrets at the time of misappropriation is inappropriate. *Univ. Computing Co.*, 504 F.2d at 535. There is no evidence that Geisman published its trade secrets or that its trade secrets are destroyed. To the contrary, it appears the relevant trade secrets continue to be a secret and valuable part of SPP's business. Alternatively, SPP requests a royalty in the amount of $1,265,191, based on its expert Gary L. Gutzler's opinion as to the value of the trade secrets in July 2018 and considering the factors set forth in *University Computing*. (Doc. No. 87-7 ¶¶ 28-59). SPP argues it is entitled to a reasonable royalty for the unauthorized use and disclosure of its trade secrets because it is unable to ascertain the true extent of the harm caused by Geisman due to his "legal ploys" in filing for bankruptcy before being deposed and then defaulting in this Court. (Doc. No. 89 at 10). Geisman asserts the Court should award SPP damages in the amount of $17,000, which is the amount Mr. Geisman earned using SPP's trade secrets. (Doc. No. 88 at 19-20; Doc. No. 87-7 ¶ 28 n.45). Given the posture of this case, including Geisman's default without completed discovery and the apparent inability to fully determine the extent of SPP's actual damages where the trade secrets are not destroyed, the Court agrees that a reasonable royalty is appropriate here.

However, the Court does not agree with either SPP's or Geisman's calculation of a reasonable royalty when considering the *University Computing* factors. The proper measure to calculate a reasonable royalty is the fair price for the trade secrets used or disclosed. SPP's

calculation is based on the value of the entirety of its trades secrets even though they are not destroyed and without considering whether they were actually used or disclosed. Geisman's calculation is based on the profit he received for the use of the trade secret without considering the value of the trade secret to SPP and without the ability to fully know his use and disclosure of SPP's trade secrets. Instead, the Court will consider the *University Computing* factors to determine a reasonable royalty in this case.

First, there is little evidence to suggest Geisman's misappropriation of SPP's trade secrets changed SPP's competitive posture. While Geisman received $17,000 for his work with VideoMyJob, this is minor compared to the work and fees SPP receives for its services. SPP's trade secrets continue to be a valuable part of its business and in obtaining clients. Second, neither party presented evidence of the amount past purchasers or licensees paid for its trade secrets. Third, Mr. Gutzler valued the entirety of SPP's trade secrets at $1,265,191, but SPP's trade secrets are not destroyed and this amount does not take into account the actual use and disclosure of the trade secrets. Fourth, given the posture of this case and Mr. Geisman's default, the nature and extent of his intent to use SPP's trade secrets is not fully known. However, Mr. Geisman did use and disclose the SPP's trade secrets when working with VideoMyJob for which he received a $17,000 profit. Further, he used and disclosed SPP's information when working with numerous other third parties for which it does not appear he received a profit.

Based on these factors the Court finds the reasonable royalty to be 20% of the $1,265,191 valuation by Mr. Gutzler. Specifically, the Court reduced the valuation amount because there is little evidence to suggest SPP's competitive posture changed as a result of Geisman's misappropriation, Geisman did not destroy any SPP trade secrets which remain a significantly valuable asset to SPP, there is no evidence to indicate Geisman used or disclosed all of SPP's trade

secrets which is how the valuation was calculated, and Geisman is permanently enjoined from using or disclosing SPP's trade secrets in the future. However, the Court concludes a reasonable royalty of more than the $17,000 profit Geisman received is warranted here because of the value of the trade secrets to SPP, the higher fees SPP receives from clients for its services wherein it uses its trade secrets, and the inability to fully ascertain the extent to which Geisman used and disclosed SPP's trade secrets because of the default posture of this case. As for the remaining claims, "the calculation of damages for the trade secret claims would be essentially the same measure of damages used to quantify the harm caused by the other non-trade-secret claims, including the allegation of unfair and deceptive trade practices." (Doc. No. 87-7 ¶ 60). Accordingly, the Court will award SPP $253,038.20.

### 2. DMCA

Under the DMCA a plaintiff may recover actual or statutory damages. "[A] complaining party may elect to recover an award of statutory damages for each violation . . . in the sum of not less than $2,500 or more than $25,000." 17 U.S.C. § 1203(c)(3)(B). SPP elects statutory damages and seeks the maximum statutory amount of $25,000 for two separate violations. (Doc. No. 85-1 at 23). When the harm caused is relatively minimal, "even the minimum award under the DMCA [is] generous." *Oppenheimer v. Griffin*, No. 1:18-CV-00272-MR-WCM, 2019 WL 7373784 at *8 (W.D.N.C. Dec. 31, 2019). "Within the permissible range of statutory damages, the Court enjoys wide discretion to set the amount of damages" and "[w]hile there need not be a direct correlation between statutory damages and actual damages, the statutory award should bear some relation to actual damages suffered." *Id.* at *5 (internal quotation marks omitted).

> Although the Fourth Circuit has not specifically described how the statutory damages should be determined, the Second Circuit has provided guidance regarding factors to be considered, as follows: (1) the infringer's state of mind; (2) the expenses saved, and profits earned, by the infringer; (3) the revenue lost by the

copyright holder; (4) the deterrent effect on the infringer and third parties; (5) the infringer's cooperation in providing evidence concerning the value of the infringing material; and (6) the conduct and attitude of the parties.

*Id.*

Here, Geisman sent VideoMyJob a document titled "Negotiation Tips – Final," which document is the same as SPP's '535 Registration and contains identifying information that it belongs to SPP. (Doc. No. 57 at ¶¶ 101, 165). After SPP's counsel advised Geisman he violated SPP's rights, Geisman sent an electronic copy of the same document to VideoMyJob, but this time he removed the indications that SPP owned the document and inserted his own name indicating that Geisman owned the document. (*Id.* ¶ 102). SPP argues it is entitled to the maximum amount of statutory damages because of the purposeful and contemplated nature of Geisman's removal of SPP's identifying information combined with the lack of deterrence after SPP's request. However, the harm caused by Geisman's alteration of SPP's copyright management information is minimal. The use was not widespread nor did it involve numerous potential SPP clients. Instead, it was limited in scope and manner. Additionally, SPP does not assert it lost any actual revenue or that Geisman profited. SPP is not entitled to the maximum statutory award. However, given the facts here, and particularly Geisman's purposeful removal of SPP and insertion of himself as the owner even after receiving demand communication from SPP's counsel, the minimum award is not appropriate. Instead, the Court will award $10,000 per violation, for a total of $20,000.

3. <u>Exemplary Damages</u>

SPP may recover exemplary damages pursuant to the DTSA, the MTSA, and the North Carolina UDTPA. Under N.C. Gen. Stat. § 75-16, courts must treble damages if a defendant violates the UDTPA. *DENC, LLC v. Philadelphia Indemnity Ins. Co.*, 32 F.4th 38, 52 (4th Cir. 2022). Under the DTSA, if a trade secret is "willfully and maliciously misappropriated, [a court

may] award exemplary damages in an amount not more than 2 times the amount of [actual] damages awarded." 18 U.S.C. § 1836(b)(3)(C). Likewise, under the MTSA, "[i]f willful and malicious misappropriation exits," exemplary damages of no more than twice the actual damages are available. Mass. Gen. Laws Ann. ch. 93, § 42B(b) (West). Geisman does not appear to oppose SPP's request for treble damages and pursuant to N.C. Gen. Stat. § 75-16, SPP is entitled to treble damages for Geisman's violation of the UDTPA. Accordingly, the Court will award treble damages.

4. Attorneys' fees

Under the DTSA, a defendant who willfully and maliciously misappropriated trade secrets can be liable for attorneys' fees. *Herrmann Int'l, Inc. v. Herrmann Int'l Eur.*, No. 1:17-cv-00073-MR, 2021 WL 861712, at *24 (W.D.N.C. Mar. 8, 2021). "Willful means intentionally . . . [m]alicious means an action taken in a manner which evidences a reckless and wonton disregard of the plaintiff's rights." *Bridgetree, Inc. v. Red F Mktg. LLC*, No. 3:10-cv-00228-FDW-DSC, 2013 WL 443698, at *19 (W.D.N.C. Feb. 5, 2013) (internal quotation marks and citations omitted). Additionally, under the DMCA, the Court, in its discretion, may award reasonable attorneys' fees to the prevailing party. 17 U.S.C. § 1203(b)(5). "In deciding whether to award fees under the DMCA, the Court may consider the motive, reasonableness of the fee, deterrence and compensation, and the ability of the nonmoving party to pay." *Dahn World Co., Ltd. v. Chung*, No. CIV. A. RWT06-2170, 2009 WL 277603, at *2 (D. Md. Feb. 5, 2009) (citing *Rosciszewski v. Arete Assocs., Inc.*, 1 F.3d 225, 234 (4th Cir. 1993)).

Here, Geisman does not appear to oppose SPP's request for attorneys' fees and in any event he did willfully and maliciously misappropriate SPP's trade secrets. Geisman began downloading SPP's files containing trade secrets to his personal computer before exiting SPP. When Mele

learned about the unauthorized downloads, Geisman assured SPP he would delete all SPP files. (Doc. No. 57 ¶¶ 44-46). Instead, Geisman attempted to download the SPP files containing trade secrets on numerous additional occasions, including after he left SPP. (*Id.* ¶¶ 47-50). He even used and disclosed SPP's trade secrets during his work with VideoMyJob for a profit. (*Id.* ¶¶ 92-93). All the while he was representing to SPP that he did not take SPP files with him after his exit. In November 2018, SPP's counsel sent Geisman a letter about his use of its information, to which Geisman responded by stating, "I'm unclear on what was misappropriated since I did not download any materials prior to leaving other than the one occasion where I did try. [Mele] found out about this since the pointers on Google Drive were messed up. The download was then reversed. . . . From that time, I didn't download any files or misappropriate SPP materials." (*Id.* ¶ 62). Thereafter, he again represented to Mele and SPP's counsel that he did not take anything from SPP when he left even though he still had, used, and disclosed SPP's files. (*Id.* ¶ 63). In fact, in 2020, during the course of this litigation, Geisman had over 11,000 SPP files on his personal electronics. (*Id.* ¶ 51). Based on these facts, Geisman willfully and maliciously misappropriated SPP's trade secrets and SPP is entitled to reasonable attorneys' fees. *See Herrmann Int'l, Inc.*, 2021 WL 861712, at *24-25. SPP shall submit an accounting of reasonable attorneys' fees and costs within fourteen (14) days of this Order.

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1. Plaintiff's Motion for Default Judgment, (Doc. No. 85) is **GRANTED**; and

2. Geisman is permanently enjoined from:

   - Using and/or altering for use SPP's name or any trademarks, logos, or any of its other registered copyrights, including:

- o Using the name "Software Pricing Partners," the abbreviation "SPP," or any of the trademarks, trade names or logos of SPP, or any derivation thereof;

- o Removing or altering any of SPP's copyright management information as defined in the DMCA; and

- o Reproducing, altering, preparing derivative works, distributing, performing, or displaying any of SPP's copyrighted works;

- Disclosing any confidential information that is not otherwise known or available to individuals or companies other than SPP and/or its current and former principals, employees, and agents, including any confidential information in the over 11,000 SPP files on Geisman's personal laptop, external hard drive, and backup hard drive, and specifically including but not limited to:

  - o SPP's files from over 210 completed projects with SPP's clients;

  - o The over 340 files from dozens of failed client proposals;

  - o The at least 250 critical files to SPP's business contained in a single directory; and

  - o The at least 1,600 files from SPP's workshop presentations;  and

- Using, disclosing, or disseminating the 134 specific files enumerated in SPP's Complaint (including any information, formulae, algorithms, etc. contained within those files) and the specific mathematical formula underlying SPP's pricing/discounting curve (including any underlying notes concerning the mathematical formula), even if the information otherwise is known solely by memory or in Geisman's head.  Geisman must return or destroy all 134 files that contain trade secrets, the mathematical formula, and any underlying notes concerning the mathematical formula.

3. Plaintiff is awarded damages in the amount of $779,114.60, which includes a $253,038.20 reasonable royalty, treble damages, and $20,000 statutory damages for two violations of the Digital Millennium Copyright Act, plus reasonable attorneys' fees and costs.

4. Plaintiff shall submit an accounting of reasonable attorneys' fees and costs within fourteen

   (14) days of this Order.

The Clerk of Court is directed to close this case.

Signed: August 31, 2022

Robert J. Conrad, Jr.
United States District Judge